Our final case for argument today is Elosu v. Middlefork Ranch Incorporated. For Bajent, if I'm pronouncing that correctly, you may begin and let us know how much time you want on reserve for rebuttal. Thank you, your honors. I'm Patrick Bajent. I will do my best to hang on to four minutes at the end here. I may please the court. This court's cases consistently hold that a testifying expert who properly supports his opinion pursuant to Rule 702 should not be excluded, even if the opposing party offers evidence that it believes contradicts the evidence that the expert relied upon. That type of contradictory evidence may be fodder for cross examination. It can give the jury something to weigh, but that's a matter of weight that does not go to admissibility. The question on this appeal for this court is whether the district court here have used its conclusion, and on the facts of this case, the answer has to be yes. The briefs here are fact intensive, but few of the facts that matter are actually disputed. This litigation came about after a fire consumed the appellant's remote cabin in Idaho. All parties agree that there were no witnesses to the moment the fire ignited. All parties agree that when witnesses did first arrive, it was sometime after the cabin was very involved with fire. The parties also agree that the heaviest fire at that time was on the east side of the cabin's wraparound deck. All parties also agree that before the fire was started, the cabin's deck was freshly covered in very flammable Penofin brand oil. It's like a deck stain. They agree that under the right conditions, this oil releases flammable vapors, and all of the parties agree that at the time the fire started, there was a standing, burning propane pilot light to an appliance located directly on the cabin's deck, the deck that had been oiled. That appliance was a propane refrigerator. It was located on the north side of the cabin's deck. It was away from where the first responders saw the heaviest flame. That's not in dispute that they saw the heaviest flame after they'd arrived at the very involved burning building. Mr. Michael Koster is the testifying expert at issue on this appeal. He's my client's expert, and he was hired to investigate the cause and origin of this fire. As explained in his disclosure, his expert opinion was that that standing, burning pilot light, which is like a candle on the surface of the deck, ignited vapors from that freshly oiled volatile stain. This flash vapor fire then whooshed across the deck's surface around to the east side, where first responders saw heavy fire and ignited a sofa that was sitting on that deck, which then ignited the building. This opinion is consistent with all of the undisputed facts in this case. No fact contradicts it directly. The district court, which was never incidentally assigned to this case until it was called to rule upon this motion, which it didn't receive. Pardon me, counsel. The issue is not whether this theory is contradicted by other facts. I think that the ruling was based on the court finding as a gatekeeper that Mr. Koster had insufficient facts under 702 B, insufficient facts upon which to apply his subsection C reliable methods. So, as I see it, the only facts which Mr. Koster had was A, what Mr. Brace and Ms. Elosu told him, that they used panophen with a roller, which leaves puddles or left puddles of panophen on the wood deck. And the second fact is that there was a pilot light in the propane refrigerator. Is it your position that those facts under 702 B are sufficient from a gatekeeper's perspective to allow Koster to apply his methodology in a reliable form to arrive at his opinion? Thank you, Your Honor. Those facts are very close to sufficient, but those aren't the only facts that the expert relied upon. What other facts did he rely upon? Your Honor, he chartered a chemical analysis of the panophen oil from an expert, Douglas Byron, who has never been challenged, whose conclusions have never been challenged, that in the presence of that standing pilot light, that would have ignited. That's one fact that he relied upon. He relied upon Mr. Mumford, another expert in this case, to assist him in ruling out other causes. He relied upon assumptions, his assumptions about the weather that day. He relied upon a wind model, which showed that the wind that day would have carried the flammable vapors to the pilot light. And I'll readily admit, that wind model is probably not admissible in this trial, but experts from both sides have testified that that's exactly the type of thing these experts regularly rely upon. And an expert, of course, under Rule 703 can do that. He also relied on the NFPA 921 standard, which has an express provision for vapor fires. And that express provision instructs experts to look for a point of origin that can be far away from where the heaviest fire occurs. And that's the issue that I think, with all due deference to the district court, it didn't quite grasp. The first responder saw fire on the east side. It concluded that that was very relevant to Mr. Koster's opinion, and he believed it was not relevant because of this special set of rules for vapor fires, where the point of origin can be very far away from the point of heaviest fire. For the vapor ignition theory, does the fire still have to start on the north side, and then it quickly moves to the east side? Or can it actually somehow start on the east side? Your Honor, it has to start on the north side because the only source of ignition, the heat that mixes with the vapor and oxygen and results in flame, the only known source of ignition in this case is that pilot light, which is on the north side. And so Mr. Koster's theory, after examining all of the evidence that he could find, was that that standing burning pilot light, based on Mr. Byron's chemical analysis and other facts, contacted those volatile oil on the deck and whooshed along the surface of the deck. We've all seen that type of thing, I suppose. It's a vapor fire. The only source of ignition was not the pilot light. There was some evidence that both Brace and Olosu had been smoking cigarettes that afternoon and had thrown cigarettes on the porch, right? Your Honor, there is no such evidence. Ms. Olosu testified that she does smoke cigarettes on occasion while on vacation. There's no evidence she put them on the porch. And in fact, the evidence that is on the porch, excuse me, the evidence that is in the record indicates that she snubs out her cigarettes in a bowl, a ceramic bowl, and that Mr. Brace had expressly instructed her to do so the morning of the fire because of the penicillin vapors. And I'll emphasize Mr. Brace is not a smoker at all. If I can also, on this, Mr. Pageant, the overall report of Mr. Koster was some 145 pages, and the court, district court noted that maybe 120 pages were photographs and charts, but there was some 20 to 25 pages of substantive analysis, which included the National Fire Protection Association 921 analysis, correct? That's correct, Judge Bennett. And I'll emphasize that the district court's note is in footnote one of page 10 of its opinion. And I want to call attention to it because, on the one hand, the district court has excluded this expert for not relying on, in its view, enough information. But on the other hand, the district court disregards hundreds of pages of his report, which the district court characterized as supporting documents. If I can also, just on this for your time here, and essentially as a result of the District of Idaho's heavy caseload, this entire matter was initially referred to the Western District of Washington for all pre-trial matters, was it not? That's correct, Your Honor. And there were competing motions for summary judgment considered by Judge Bryan that were denied on both sides. Both sides filed motions for summary judgment, and it was denied. Is that not correct? That's correct, Your Honor. And then ultimately, it comes back to the District of Idaho to Judge Nye for trial preparation. And the case is finished. Discovery's done. Motions have been denied. The case is going to trial. And then this finally was triggered by a motion in limine as trial approach with respect to Mr. Costner's report. Correct? That's correct, Your Honor. And that's an important point, Your Honor. The district court in this case, because of its caseload and because of COVID, really had no more familiarity with the facts of this case than Your I read that your case was eviscerated as a result of the ruling and that you could take it, treat it as summary judgment, and take it to the Ninth Circuit. That's essentially procedurally what happened, correct? Correct, Your Honor. And I want to emphasize that because although many elements, this court has a multi-part standard of review, but the heart of it is abuse of discretion as to the district court's application of facts to the law and clear for the district court's construction of facts. And we all know the very good reasons that we have. We afford district court's broad discretion, but it's worth noting. In this case, the district court did not have the type of intimate familiarity with the parties, the case, the facts and the history that would ordinarily happen in ordinary trial. Do I mean interrupt you? But do I also not understand that the Middle Fork Ranch Incorporated did not challenge Mr Costner's qualifications? Is that correct? That's correct. And the Middle Fork Ranch Incorporated did not challenge the methodology. That's correct, Your Honor. Nor its relevance. Nor, Your Honor, did they challenge that the opinion would be helpful to the trier of fact. I would refer the court to the Alaha case, I hope I'm pronouncing that correctly, which considered this exact issue of vapor fire in the absence of direct evidence that was not disputed as being helpful to the trier of fact, and it was not disputed as following the proper methodology. It's a Southern District of New York case where, on very similar facts to this, the district court correctly ruled that the expert's testimony was admissible. Did any of the first responders testify? And I may have to double check the record that they didn't see any fire on the north side. One first responder, Your Honor, ran around the cabin to the north side. He testified that he saw heavy smoke. He was able, I believe, to approach the deck, maybe even stand on the deck and bang on a window to determine if anybody was inside the building. But again, that's consistent with the vapor fire. When that pilot light to the refrigerator on the north side of the deck ignites the vapors coming off the penicillin oil, it's just burning the vapors in the air. It's carrying the flame around in those vapors. It's not necessarily igniting the structure. Mr Costner's opinion was that when the burning vapors hit the sofa, which is a volatile, you know, fabric type piece of furniture, they were able to ignite the sofa and other items that were down there on the east end of the deck, which then caught the building on fire. So I apologize for the long answer. The short answer is yes. The one witness who saw the north side of the deck did not see flames on the north side of the deck, but that's perfectly consistent with Mr Costner's opinion. Thank you, Your Honor. I have about three minutes and 50 seconds. I think I'll reserve those. If the court has no other questions, Cobbler. Thank you, Your Honor. Jerry Cobbler. On behalf of the appellees, may please the court. Um, there's no dispute as the standard that's going to be applied here. It's an abuse of discretion standard. We're talking about the ruling on the Daubert motion regarding exclusion of experts, not the subsequent summary judgment, which was a stipulation in order to get to this appeal. So I wanted to start there. Um, in as far as the facts go, um, Mr Bajan has argued in the brief a number of times has has just pointed out that while the heaviest fire was on the southeast corner, that is seen by the initial, uh, contractors was on the southeast corner and and in their depositions. We went through that in detail where we had them draw out on both photographs and in maps where the first fire was. Mr Costner's analysis and Mr Costner's theory is that the pilot light on the deck. It's kind of a horseshoe wraparound deck on the north side of the cabin is where the fire started due to igniting vapors. And then what the vapors did is it ignited the oil on the deck, the excessive oil on the deck on the north side and then all the way down the east side to the sofa on the southeast corner. The problem is there is no fire on the north deck. There is no fire on the north side of the east deck. It's not as as council has argued in briefing here today that that there was fire all along the north excuse me all along the east deck with the heaviest fire at the sofa. That is, there is no testimony after that, which was interesting because, um, we pointed out that two of the witnesses that were that were opposed, uh, the head of the contractor's crew, Mr Pyle and then the first, um, fire inspector that went to the scene a couple days after the fire. Both of them testified that that the plaintiffs in this case or the appellants in this case tried to get them to say that there was fire on the north side or fire on the north half of the east deck. And both of them refused to do that because that wasn't what they saw or part of the testimony. All three of the contractors that testified were asked, did you see fire on the north side of that east deck? And all three of them said no. And one of them who went all the way around to the north deck actually said, and there was no fire on the north deck. So it's not, it's not consistent just to say, well, there's the heaviest fire on the east deck. Um, second is the, this report that Mr Koster had, um, in all of the report, it says what he did. It says what he, he, he reviewed everything else. This is, uh, again, approximately a year after the fire. He's sifting through this, uh, the site. This is the same site that one of the other, one of the first fire investigators said was a black hole. It was just, there's no evidence to determine, uh, anything. Um, and, and in looking at that, um, he puts that in his report, but in his deposition, when I walked through, he had six bases, which he said supported his, um, his conclusion. And of those six bases, we walked through each of them and he acknowledged, and this is at, uh, at the, uh, uh, volume two of the evidentiary record from, I believe it was approximately 137 to about 166. Uh, we walked through each of the six bases, um, and, and each one of them, he acknowledged, well, that doesn't support my theory. You know, it included the video footage, which he acknowledged. Yeah, we don't have any video. We don't have any photos. Um, they show, actually, they show big fire on the east side. Uh, it, it, it, it involves the of the witnesses who said, like I've just, uh, laid out, that there was no fire on the north side and there was no fire on the, on the north side of the east deck. And then he says, and he reviewed all the data. What is, is most interesting to me and frankly, um, most illustrative is the, the, the, the vapors that were evaporating, that had been evaporating for 20 hours. Again, that's, it's inconsistent with the Penofin manufacturing, uh, label, but in any event, he acknowledged he doesn't know, uh, where the vapors were. He doesn't know their concentration. He doesn't know if they were on top of the deck or under the deck, but more so with, with regard to the temperature, his theory is also relies upon the fact that, that the temperature exceeded, it heated up those vapors and it exceeded the flashpoint, uh, uh, to where this could happen. The problem is we have no evidence, none about the temperature. There's no data. There's not even, there's not even testimony from, uh, from Miss Olosu who was there saying, uh, it was, you know, however many degrees. What we have is, is, um, testimony from Mr. Koster when I asked him about all that stuff. Um, you know, do you have weather data from Pistol Creek, from that area? Again, this is a remote cabin in the, in the mountains of central Idaho. Um, and he said, no. Do you know what the temperature was on the deck itself? No. Do you know what the temperature was in the shade versus in the, uh, in the sun? No. Do you know what the temperature was under the deck? Because there's a void space under the deck. Uh, there was, the deck was powerwashed beforehand, so there would have been a water there. So the, the oil would have mixed with water. Do you know the temperature? You know, all of those things we asked him and his, and his response was, no, I have no data. I am assuming that it was. And so what we're left with is he starts with the and then assumes the data or assumes the evidence to support his theory. And that is, he assumes that there was, there was penicillin, uh, excuse me, the xylene, uh, vapors, um, evaporating from the penicillin. And he assumes the temperature got to a, to a point sufficient to start a fire to then prove his theory. And his theory is, well, that must have happened. And that must have happened. And that's what. Did he not, if I can, Mr, um, Kobluk, did he not indicate that it is a theory that he acknowledged there may be two competing theories? Uh, and I believe that there's great emphasis been placed upon the fact that, uh, his opinion was such that he, that you could look at either theory. I don't know that he said he was the only, his theory was the only acceptable theory, did he? No, he, he did say, and he did testify that he when asked about, okay, what, what supports your theory? What evidence supports your theory? And he said, well, it's not about proving my theory. It's about disproving the others. Well, I mean, I, but he did not, I don't think the record reflects that he rejected, um, the, the theory of the opposing side on your theory. I think he indicated that clearly, I think the thing that I, obviously my earlier question stands in mind is, is that he absolutely never, your client never challenged his methodology of this whatsoever. And in light of the fact that it was in compliance with professional standards, isn't that correct? It is correct that we did not challenge, uh, his qualifications or his methodology. It's a given, it's a given, it's a given. And in, in terms of, uh, I find, if I can just for a moment here, I, it's a great honor to be here on this court and, uh, uh, the, my distinguished colleagues, but I live and breathe this as a district court judge all the time. And I'd be interested in your view in terms of how often on Dalbert challenges, you have both sides totally agreeing on the qualifications of an expert, totally agreeing on his methodology, totally agreeing on his analysis of professional standards and ultimately comes down that they're insufficient facts. Um, that's a little rare. Is it not in a Dalbert analysis? That is a bit unusual. If I can just, I don't mean to interrupt you, but it's, I just want you to know, cause I want you to have a chance to respond to my questions. I was quite caught by the transcript here because I find it highly unusual. I tried to rely upon 18 and a half years on the bench dealing with more than a few Dalbert motions. And the battle is always, it seems on qualifications, on the methodology, faulty methodology. This case stands out in that it's absolutely given with respect to the professional standards given in terms of qualifications. It's just judge Nye felt that the facts upon which he based his theory, judge Nye felt were speculative. Isn't that really the word that he used? It was speculative. Well, it was speculated because it had no factual basis. And again, even, even Mr. Koster admitted that all of the basis that he listed don't support his theory. All he argued was it doesn't disprove his theory. And that's a very big, big distinction, even in Dalbert. And Dalbert said specifically that expert testimony must be supported by appropriate validation. In other words, there must be good grounds based on what is known, not the assumptions or speculation. And that's what we have here. We have, we have a conclusion in which at most the, the expert is saying, well, I can't disprove it. And all of these, all of these facts that I have don't disprove, well, they don't disprove all the other. Well, let me just, I can't, I think your point's well taken on that. The difficulty I think you have, and the reason that it's quite clear to me that it is very rare, very rare for a district court judge to find qualifications, methodology that are undisputed, but then find the facts are speculative is, is that this court, like most circuits around the country, and in this, it's Alaska Renicar versus Avis, Ninth Circuit opinion 2013, has specifically held that the district judge is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury. Because the gatekeeper function of the district court, even in the discretion, does not allow a district judge, or certainly a district judge has to be very careful to invade the province of a jury if it rejects such a theory. And that's, that's clear case law, is it not? No, it is. And, and the district court actually addressed that. And in the district court's opinion, it did, it did identify the fact that we are not, we meaning the court, sorry, the district court is not tasked with weighing the evidence or determining which side is right or wrong. But the court still must look to see if the evidence is supported in the first instance. That's the gatekeeping function. Counsel, perhaps I could sort of summarize your points to see if I have them correctly. You're saying that under 702B, there was insufficient facts for this witness to employ his expertise. And those insufficient facts consist, as I see it, number one, that there was no evidence of any flame at the northern pilot light location observed by any of the persons who came to the fire when the fire was raging. In other words, I take it Mr. Badgett would have to say that the vapors were, were put on fire without being seen by anybody who got there. So there's no, there's no visualization of any flame in the northern portion. There's no evidence of the concentration of the panofin at the northern area. There's no evidence of any temperature which would cause the fumes due to evaporation. So that there is no basic factual matter sufficient for this witness to have hypothesized that the flames started without being seen on the northern edge and transmitted to the eastern edge and therefore, and got the sofa on fire. Is that more or less what you're saying? It's close, Your Honor. Yeah, the idea that there was no flame on the north. Remember, the theory is not just that the vapors flashed over and then ignited the sofa. The theory from Mr. Koster was that the, was that the pilot light lit the, or lit the vapors, which in turn lit the oil on the deck. Right. So the oil on the deck from the north side then all the way down the east deck. So the pilot light ignited the vapors which caused an invisible fire to go from the north edge to the east edge. I don't know if that that was his testimony in terms of an Nobody saw a fire on, none of the contractors saw a fire on the north edge. Correct, and that's inconsistent with his theory. His theory is that there, the oil on the deck would have readily burned all the way down to that sofa. And that was something that's just inconsistent. It's also inconsistent that that the fire, one of the contractors kicked in the front door on the opposite side of the cabin and there was fire on the inside of the cabin. This is before he went to the north side and there's no fire on the north deck. So that's even inconsistent as well. But, but again, we weren't weighing the evidence. I think the district court properly determined as a matter of its gatekeeping function that the evidence did not support, there was, there was no sufficient evidence to begin with on, on the underlying case. It's not even a matter of weighing the evidence. I see my time is up unless you have any further questions. Thank you. Nothing. Thank you, Your Honors. Taking Judge Bea's questions first, on 702B insufficient facts, Your Honor had asked, uh, you know, is it sufficient that, you know, because the witnesses did not see fire on the north deck, does that, you know, does that mean there's an insufficiency? Well, Mr. Kobluk has told you that that means there's an insufficiency, but no expert has told you that that's an insufficiency. No expert has come to you and said there would have been sustained fire on the north deck even in the presence of a vapor fire. And this is what we mean in our brief by weighing facts. We have attorney argument, but we have this unrebutted expert testimony. Mr. Koster's theory is that this is a flash vapor fire, the kind that goes poof, uh, and that, that, that that is what carried the heat from the point of ignition around to the sofa. Similarly, Your Honor, as to concentration of oil or stain, it's simply false to say that there is no evidence of that. Mr. Koster's report, including the supporting documents that the district court did not read, contain calculations of how much oil should have been used on the deck and how much oil actually was used. The expert measured the amount of oil consumed and calculated that one gallon in excess was used. That calculation was the basis of Douglas Byron's chemical analysis, concluding that under these conditions, a flash vapor fire could have occurred. Similarly, it is false to say there is no temperature data. The wording in the depositions in this argument have been very carefully put. There is no temperature data or the deck at Pistol Creek. However, there is temperature data or weather stations located in the vicinity. That was the basis of the experts assumptions. It was based on a fact, and he inferred and assumed from those facts as an expert does. Finally, I'd like to turn to Judge Bennett's observations about methodology. It hits the nail right on the head. No party disputed the methodology in this case. No party disputed qualification. No party disputed relevance. But the district court's ruling excludes our expert based on a methodology analysis. There's a part about facts we've been discussing, but he says, I rule as a matter of law, and he says, I take this seriously, but I rule that inferring a conclusion based on the absence of contradictory evidence is an inadmissible methodology. That is the opposite of what 921 says, which no party has disputed. It instructs experts to gather evidence, rule out and reach a conclusion. And it's the opposite of what the facts in this case are. The expert did consider facts. So with all due respect to the district court, it just got it wrong. It hadn't had the case for long. It received no argument. It took the briefing and it issued a ruling that's wrong under Daubert, under the methodology prong, and it's wrong on the facts. We urge you to reverse. Thank you, Your Honors. Thank you. The case has been submitted and we are adjourned for the day.
judges: BEA, LEE, Bennett